## STATE OF MAINE *vs.* HANSON FIELD.

It is not competent for one indicted for manslaughter to prove on the trial, that the deceased was well known and understood generally, by the accused and others, to be a drunken, quarrelsome, savage, and dangerous man.

*Hanson Field* was indicted for manslaughter in killing one *Nathaniel Field,* on the 22d of *Dec.* 1835. The prisoner and the deceased both occupied different parts of the same house. It appeared at the trial, that the prisoner and the deceased had both been drinking on that day, and had had a violent quarrel about half an hour before the one in which *Nathaniel* was killed, in which both were badly injured, the injury to *Nathaniel* having been inflicted with an axe. Afterwards, *Nathaniel,* who was a much younger, and more vigorous man, than the prisoner, went into a room in the part of the house occupied by the prisoner, but which each had an equal right to occupy, where the prisoner was, and immediately on entering was struck by the prisoner with an

axe and instantly killed. It was proved that *Hanson Field* was passionate, and accustomed to use threatening language, when intoxicated, but was not considered dangerous; and that when sober he was a kind and peaceable man, and good neighbor.

The counsel for the prisoner offered to prove, that the deceased was a man in the habit of drinking to excess, whenever he could get rum, and that drinking spirit of any kind uniformly had the effect to make him exceedingly quarrelsome, savage, and dangerous; that he had, when in liquor, frequently threatened the life of his wife and others; and that the prisoner had more than once been called upon to protect his wife and family from his drunken fury; and that his habits and character were well known and understood by all about him. *Emery J.*, who presided at the trial, refused to admit this evidence, and ruled, that no evidence of his drinking or habits could be received at any other time, than on the day that the deceased was killed. The verdict was guilty. To this ruling and decision of the Judge, the counsel for the prisoner excepted.

*W. P. Fessenden*, for the prisoner, said, that guilt, or innocence, depended on the state of mind and motives of men. To ascertain this, the evidence offered was pertinent and proper. The accused had the right to shew such facts, as would convince the jury, that he had good reason to believe, from his knowledge of him, that the deceased would kill him, unless he protected himself. If the accused thought, from his knowledge of the character and conduct of the deceased, when he broke into the room, that his own life was in danger, he was justified in cutting him down for the preservation of his own life. The evidence should then have been admitted. The authorities go to that extent. 5 *Yerger*, 459; *U. States* v. *Wiltberger*, 3 *Washington's C. C. R.* 515.

*Clifford*, Attorney General, for the State, contended, that this evidence was inadmissible. The character of the deceased cannot be given in evidence, but in one single case; when he is made a witness by giving his dying declarations in evidence. This exception is made on the ground, that if he was alive, his testimony would be worthless. 2 *Russell on Crimes*, 688. It is not competent to shew, that the accused has a general disposition to com-

mit such offences, as are charged upon him. 1 *Phillip's Ev.* 143. In this case, every thing connected with this transaction, in fact, every thing which took place that day, was permitted to be given in evidence. This is the utmost extent of the right, unless when the dying declarations are given in evidence. His character is no part of the *res gesta. Commonwealth* v. *Hardy,* 2 *Mass. R.* 303; 5 *Ohio R.* 227; *Roscoe's Ev.* 71. Proof of a general disposition to commit crime is inadmissible. 1 *Phill. Ev.* 143; 2 *Stark. Ev.* 368 and 964; *Rex* v. *Clark,* 2 *Stark. R.* 241.

The evidence was rightly rejected, because, if it had been admitted, it could not have furnished any ground of defence. The mere fear of danger affords no justification. There must be actual danger at the time, and some overt act towards it; and the accused must be free from fault himself. *Roscoe,* 638; 1 *East's P. C.* 271; *State* v. *Wells,* 1 *Coxe's R.* 424; 1 *Russell,* 551; 2 *East's P. C.* 239; 1 *Hawkin's P. C. c.* 28, § 22.

The opinion of the Court, after a continuance, was drawn up by

EMERY J. — The defendant, on an indictment for manslaughter, for killing *Nathaniel Field,* on the 22d *Dec.* 1835, has, by the verdict of a jury, been found guilty. In the course of the trial, evidence was proposed to be offered, that the deceased was a man in the habit of drinking to excess whenever he could get rum, and that drinking spirit of any kind uniformly had an effect to make him exceedingly quarrelsome, savage, and dangerous, that he had when in liquor frequently threatened the life of his wife, and others, and that the prisoner had, more than once, been called upon to protect his wife and family from his drunken fury, and that his habits and character were well known and understood by all about him.

The judge refused to admit the evidence, and ruled that no evidence of his drinking, or habits, could be received at any other time than on the day aforesaid.

The argument of the defendant's counsel is, that if the defendant had good reason to believe, that *Nathaniel,* the deceased, intended to kill him, and that he burst open the door with that intent, that the evidence of the savage and dangerous character of *Nathaniel,* when in liquor, and his habits of drinking ardent spirits, should have been admitted to relieve the defendant from the imputation of guilt,

because it would be inferred that he acted promptly to preserve his own life; that his motive was justifiable.

A case in 5 *Yerger*, 459, and the cases of the *United States* v. *Wiltberger*, 3 *Washington's C. C. R.* 515, and *Selfridge's* case are cited in support of the positions assumed by the counsel for the defendant. *Wiltberger's* case was finally decided in the Supreme Court of the *United States*, on a question of jurisdiction, in favor of the prisoner, notwithstanding the verdict against him in the Circuit Court. 5 *Wheat.* 76. But to the law, as stated to the jury by *Judge Washington*, upon the branch of the case, in any degree applicable to the present topic, we cordially assent. " A man may oppose force to force in defence of his person, his family, or property, against one, who manifestly endeavors by surprize or violence to commit a felony, as murder, robbery or the like. But to justify killing the aggressor *his apparent intent* must be to commit a felony. That *apparent intent* is to be collected from the attending circumstances, the manner of the assault, the nature of the weapon used, and the like, and it must appear that the *danger was imminent*, and the species of resistance used, necessary to avert it."

Of the benefit of all these attending circumstances, the defendant, *Field*, availed himself on the trial, through the faithfulness and ability of his counsel.

The trial of *Selfridge* took place in 1806. That of the *United States* v. *Wiltberger*, in 1819. And perhaps it would be doing no injustice to the high desert of the learned Judge *Washington*, who presided in the latter trial, to imagine that he might have had the benefit of the lucid charge of the late Chief Justice *Parsons* to the grand jury, so far as it is made known, in the commencement of the report of *Selfridge's* trial, as well as of the interlocutory decision, so to speak, of Judge *Parker*, and his charge on summing up to the jury of trials. The coincidence of expression is striking. *Parsons* C. J. had charged the grand jury, that a bare fear, however well grounded, unaccompanied by any open act, indicative of such an intention, will not warrant him in killing.

*Austin*, the young man slain, was the son of a gentleman, against whom the defendant, *Selfridge*, had published in a newspaper a libel on the morning of the conflict. The deceased was standing with a hickory cane in his hand near the corner of *Suffolk* build-

ings, in *Boston.* Having cast his eyes upon *Selfridge*, who was coming down, crossing *State-street* diagonally toward the *U. S. Bank,* his hands behind him, outside of his coat, without any thing in them; *Austin* shifted his cane into his right hand, stepped quick from the side-walk to the pavement, advanced upon the defendant with his arm uplifted. As the deceased approached, the defendant put his right hand into his pocket and took out his pistol, while his left arm was raised to protect his head from an impending blow. The defendant turned, stepped one foot back, a blow fell upon the head of the defendant, and the pistol was discharged at the deceased, at one and the same instant. Several blows were afterward given, and attempted to be parried by the defendant, who threw his pistol at the deceased, seized upon his cane, which was wrested from him by the deceased, who becoming exhausted, fell down, and in a few minutes expired.

The late learned and excellent Judge *Parker*, alike distinguished for native sagacity, courtesy of manners, benevolence, and intrepidity in discharge of duty, who, previous to his advancement to the station of Chief Justice, presided at the trial of *Selfridge,* in charging the jury, doubted whether self-defence could in any case be set up, when the killing happened in consequence of an assault only, unless the assault be made with a weapon which, if used at all, would probably produce death. The stress of the case, in the Judge's mind, was for the jury to settle whether the defendant could probably have saved himself from death, or enormous bodily harm, by retreating to the wall, or throwing himself into the arms of friends who would protect him.

The case probably is cited more particularly to show, that the ruling excepted against was too circumscribed, because in *Selfridge's case* an examination was had to see whether the assault was by the procurement of the defendant, when the whole story of the misunderstanding between the defendant and the deceased's father was heard by the jury. But the Judge declared, in his charge to the jury, that he thought it was going too far back to have an influence on the trial, but which the urgency of the Attorney General, and the *consent* of the defendant's counsel, finally induced the Judge to admit. On the motion to admit the evidence, he observed that his own opinion was, that nothing was proper evidence excepting what

The State *v.* Field.

took place on the same day, or very shortly before ; and more particularly, that any thing which went to show a previous quarrel with another person, or even with the same person, was not proper, the law being clear that no provocation by words would justify blows.

So far, then, as we apprehend the law on this subject, we perceive nothing in two of the cases cited by the defendant's counsel, militating with the ruling of the Judge, in the case at bar. The case cited from *Yerger's Reports*, we have not been so happy as to see. We regret it the more, because of the high reputation of the Court and of the reporter. We must be contented to take the law as we find it this side of the *Alleghanies*.

It would not be allowable to show on the trial of an indictment, that the prisoner has a general disposition to commit the same kind of offence, as that charged against him. 1 *Phil. Ev.* 143. Although the deceased may have been a savage and quarrelsome man, when intoxicated, he still was entitled to the protection of the law. He was not, from any evidence, unlawfully in the house. We look in vain among the attending circumstances of the melancholy catastrophe, for a provocation, or an excuse, for the resort to the deadly weapon, which the defendant used to destroy the life of his victim. And to allow the introduction of evidence of the character of the deceased, and his habits of drinking at other times, and their consequences, could have no legal efficacy in reducing the crime of which the defendant stood charged, to justifiable or excusable homicide.

The permission given to the defendant, as to evidence of what transpired that day, was as liberal as the principles of the administration of criminal justice would authorize the Court to grant.

*The exceptions are overruled.*