LEWIS HARRIS v. THE STATE OF MISSISSIPPI.

1. CRIMINAL LAW—MURDER—THREATS.—No mere threats by the deceased are admissible on a trial for murder in justification or palliation of the homicide, unless, in addition to such threats, there was also, at the time of the killing, some attempt or demonstration by the deceased showing a present purpose and immediate danger of

carrying such threats into execution, or of doing the defendant some great bodily harm. Such threats, to be admissible, must be a part of the *res gestæ.*

2. MURDER AND MANSLAUGHTER—INSTRUCTIONS TO JURY.—It is error for the court, in a murder trial, to so instruct the jury as to exclude every fact save the mere killing. Such an instruction, in a doubtful case, or in one in which the jury may be thereby influenced to the injury of the accused, would be good ground for a new trial.

3. PRACTICE—ERRONEOUS INSTRUCTIONS.—The accused, in a clear case of guilt, refused a new trial, notwithstanding some of the instructions given at the request of the state were erroneous.

4. "IMPROPER COMMENTS" BY THE PRESIDING JUDGE.—Comments and remarks by the court, in the presence of a jury, or in vindication of the dignity and impartiality of the court, when assailed, are no ground of error.

ERROR to the circuit court of Washington county. SHACKLEFORD J.

The opinion of the court states the case.

*Percy & Yerger*, for plaintiff in error.

The court erred in refusing to allow the cross-examination of the witnesses for the state in relation to the feelings that existed between the accused and deceased at the time of the homicide, by showing that a previous difficulty had occurred which led to the homicide. Bish. Cr. Law, § 618, *et seq.*; Head v. the State, 44 Miss. 753; Wesley v. the State, 37 ib. 327 ; Newcomb v. the State, Morris State Cases, 1303, and cases cited; 2 Bish. Cr. Law, 617; 3 Greenl. Ev. 124; 1 Archb. Cr. Pr. and Pl. 793, 797, 798 ; Pritchet v. the State, 22 Ala. 39.

The first and second instructions asked for by the accused and refused by the court were correct, and should have been given.  Wesley v. the State, 37 Miss. 349 ; Head v. the State, 44 ib. 731.

*J. S. Morris*, attorney-general, for the state.

*W. T. Deason*, for the same side.

Under the circumstances, the accused could not properly have been · allowed to prove a pre-existing malignant feeling of the deceased towards him, nor to

justify or palliate the killing, on the ground of threats made by the deceased. Because the proof shows that there was no imminent danger of such threats being carried out. The bare belief by accused that the deceased intended to slay him, is insufficient to reduce the killing to the grade of manslaughter. There must be an overt act on the part of the deceased, before the accused can be in the least justified in killing him. State v. Scott, 4 Ired: 415; Newcomb v. the State, 37 Miss. 401; Morris' State Cases, 1303, and cases cited in notes. The verdict is sustained by the evidence, and the instructions given correctly expounded the law of the case. 39 Miss. 540; Morris' State Cases, 1075, 1374, notes. If an instruction be too broad the court has the power to modify it. Boles v. the State, 9 S. & M. 465; Keithler v. the State, 10 ib. 192; Cicely v. the State, ib. 202; Lambeth v. the State, 23 Miss. 322; Green v. the State, 28 ib. 687; Cotton v. the State, 31 ib. 504; Morris' State Cases, 397, 403, 435, 708, 788, 915, notes.

TARBELL, J.:

At the May special term of the Washington county circuit court, 1872, Lewis Harris was indicted, tried and convicted on a charge of murder. A motion for a new trial and in arrest of judgment being overruled, a writ of error was prayed out. The defense in the court below appears to have been conducted with determined energy, and a reversal is strenuously urged here in a labored argument, but the facts and the law are strongly adverse to the accused. The circumstances of the killing, as testified to by several witnesses, were these: Harris, according to some of the witnesses, with a gun on his shoulder, while others say he had it at a ready, sought Barlow, and found him unarmed. A part of the witnesses testify that the two were approaching the same point from opposite directions, but

the truth undoubtedly is, as stated by others, that Barlow was standing, talking to a comrade, when Harris approached, saying to him, " I understand you said you intended to kill me at any time." Barlow said, " I did not say it." According to one witness, Harris then said, "if you said you would kill me, I intend to kill you now." As related by another, he said, " if you did, I have a great notion to kill you." Another witness states it thus : " I' ve a good will to shoot you, any how. To this, one witness says, Barlow replied, "shoot and be d—d," while all the others say he ejaculated, " shoot and be G—d d—d." It is undisputed, that Barlow was shot in the side. One witness testifies, that Barlow advanced two steps towards Harris and turned aside; all agree that he turned away, as he said "shoot and be d—d," or "shoot and be G—d d—d, upon which the shot was fired, striking him in the left side. It is not pretended that Barlow was angry, threatining, or hostile in his manner, attitude, gestures, or movements. There is no pretense of an " attempt" or manifestation of an attempt or "design" on the part of Barlow to commit a felony upon Harris, or to do him any bodily harm. In this condition of the case, counsel for the accused propounded interrogatories to witnesses, intending to prove previous threats by Barlow to take the life of Harris, of which the latter was advised, and also a personal difficulty two or three weeks prior to the killing. The evidence thus proposed to be introduced was objected to by the prosecuting officer, and excluded by the court.

In the course of the trial the court said, "he had nothing to do with making the law; that the law, instead, should be the only governing rule; he proposed to administer it as he found it in the books; he was blind to all, save duty; and if the juries of the country chose to allow outside matter to influence them in the rendition of their verdicts, that must be settled

between them and their God; juries had no right to make laws; if, as stated by counsel, they chose to acquit for reasons not known to the laws, that was their business; what punishment they will receive for thus perjuring themselves he did not know." To which comments counsel excepted, and they are incorporated in the bill of exceptions.

The following instructions were given for the state:

" 1. To make a homicide justifiable on the ground of self-defense, the danger must be either actual, present and urgent, or the slayer must have reasonable ground to apprehend a design on the part of the deceased to commit a felony, or to do him some great bodily harm, and that there was imminent danger of such design being accomplished, and hence the mere fear by one person that another designed to take his life will not justify the former in taking the life of the latter.

" 2. Every killing with a deadly weapon is presumed to be malicious, and amounts to murder, until the contrary appears from circumstances of alleviation, excuse or justification, and it is incumbent on the accused to make out such circumstances of excuse, alleviation or justification to the satisfaction of the jury, unless they should arise out of the evidence in the case produced against him or arise out of the whole evidence in the case.

" 3. To justify the killing of a human being in self-defense, it is necessary for the accused to show, that the danger was actual and imminent at the time of killing, and if the jury believe from the evidence that the accused shot the deceased, and that he was not acting in self-defense, but through mere fear, and was in no imminent danger from deceased, they must find him guilty as charged.

" 4. If the jury believe from the evidence that the accused killed the deceased as charged in the indictment, they will find him guilty as charged."

Two instructions based upon a case not made by the evidence, instructions framed upon the assumption of proof of anterior threats and personal difficulties, not permitted by the court, and not correct legal propositions, even if upon facts in the case, were refused. The following instructions were asked by the accused: "The law presumes every man to be innocent until he is proven guilty, and it devolves upon the state to make out its case to the satisfaction of the jury before the prisoner can be called upon to justify himself, and if the jury entertain a reasonable doubt arising from the evidence as to the prisoner's guilt, they will give the prisoner the benefit of that doubt, and acquit." This instruction was modified by the court by substituting the words, "that the defendant killed the deceased, Henry Barlow," for the words, "as to the prisoner's guilt," and thus given, the jury having returned a verdict of guilty, a motion for a new trial was made upon the following grounds: 1. That the instructions were contrary to law; 2. The first and second instructions asked by the prisoner were improperly refused; 3. The instruction given for the accused was improperly modified; and, 4. Evidence offered by the accused was improperly rejected. This motion was overruled, as was a motion in arrest of judgment, on the same points.

The errors assigned here embrace the rejection of the proposed proof of prior threats (communicated to Harris) of Barlow upon the life of the former, and of a personal difficulty anterior to the homicide; exceptions to the comments of the court, set forth in the bill of exceptions; objections to the instructions for the state; refusal to give two instructions asked; the modification of the one given for the accused; and the overruling of the motion for a new trial.

The homicide in this instance was wanton, brutal, atrocious—indicating a depraved heart and a brutalized

mind; as it was without justification, excuse or palliation. Judging from the records in this court, such cases of depravity are on the increase, and their suppression is demanded by every consideration of a public and private character. While the courts must adhere to reason and justice, as developed by time, experience and enlightened adjudications, they must, nevertheless, enforce the laws with all the rigor of which they are capable, as a duty alike to the law-abiding and the criminal. For, should it become the recognized right of a man to pursue and shoot down another for a threat to take life, simply, without any overt act indicating an intention to carry the threat into execution, crime and violence would run riot; this earth, which ought to be a paradise, would be turned prematurely into worse than pandemonium; and mankind would, from choice, seek an asylum in the abode of Satan himself. In the case at bar, the killing had not the shadow of self-defense for its consummation. The deceased was in no situation to endanger the life or limb of the accused. He was unarmed, and manifested no intention, present or remote, to commit a felony upon his slayer, and denied that he had threatened him. There was nothing in the words, acts, attitude or manner of Barlow, indicating impending or prospective danger to Harris. To allow prior threats to be given in evidence, under such circumstances, upon the mere proof of a naked and wanton killing, as in the case at bar, would be to invite a multiplication of tragedies, already clothing the state in blood and boding the worst evils to society. Statutory changes of common law have gone far to facilitate escape from the penalties attached to the unlawful killing of a human being, to which a few adjudications have contributed not a little; but the alarming increase of crime demands a restriction rather than an increase of those changes, and is dictated alike by mercy and justice.

This is not of the class of cases wherein the character of the deceased, including prior threats and difficulties, constitutes, necessarily, a part of the *res gestæ*, and is inseparable from the immediate act of killing, as in Chase v. State, 46 Miss. 683, and cases therein cited; neither is it a case of mutual combat, where threats and difficulties are a necesssary ingredient; nor of a secret homicide, where prior threats of a party tend to identify the criminal; it is not excusable homicide under section 2632 of the Code, because the killing was not "by accident and misfortune," nor the result of a "combat;" it is not manslaughter according to section 2633 of the Code, because all of the conditions specified are wanting; it is not within sections 2637 and 2639, because the killing was not in "necessary self-defense," unless, when the life of a man has been threatened, he may, as a preventive remedy, pursue, and on sight shoot down the person so having threatened, though unarmed and not resisting, and this is the proposition at bar; it is not within section 2638, for the reason that the deceased was not killed while in an "attempt" to commit a "felony;" nor within section 2640, because not "engaged in the commission of a trespass or other injury to private rights or property, or engaged in the attempt to commit such injury."

Is it within section 2631 of the Code? So much of that section as is applicable to this case is as follows: "The killing of a human being    *    *    shall be justifiable,    *    *    when committed by any person, in resisting any attempt, unlawfully, to kill such person, or to commit any felony upon him,    *    *    or when committed in the lawful defense of such person    *    * when there shall be reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and there shall be imminent danger of such design being accomplished.    *    *    Plainly, as the reading shows, the killing shall be justifiable only when

it presents the one or the other of the following elements:

1. That the killing was in resistance to an "attempt" on the part of the deceased to kill the slayer, which is not pretended in the case at bar. A prior "threat" is not an "attempt" in law or ethics.

2. Or it must have been done in self-defense, "when there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury," and there shall, also, "be imminent danger of such design being accomplished;" by which it will be perceived that to render homicide justifiable, under this branch of § 2631, Code of 1871, three conditions are necessary: (1) Self-defense, where there is (2) reasonable apprehension of a design to commit a felony or do some great personal injury; and (3) imminent danger of the accomplishment of the design. The popular delusion, to which a few decisions have contributed, that for a threat to take life a party may be pursued and killed, though unarmed, unoffending, and committing no overt acts, cannot be too soon eradicated. It should be known that he who slays another does so at his peril, and takes upon himself the responsibility of satisfying a court and jury that the act was justifiable or excusable homicide, or manslaughter, within the provisions of the code, under which a mere prior threat is not in the one case an "attempt," nor in the other "reasonable ground" of apprehension in the absence of "imminent danger," real or apparent; and lastly, it is wanting in the alleviating circumstances required to constitute manslaughter.

But it is unnecessary to elaborate further. The rejection of the proposed evidence was in consonance with the code, the authorities and reason. Ch. 58, art. 21, Code of 1871; Evans v. the State, 44 Miss. 762; Durrah v. the State, ib. 789; Head v. the State, 44 ib. 731. In the last case named, the court say: " A fear or appre-

hension arising from previous threats which had been communicated, afford no excuse, none whatever, unless at the time of the killing an effort was being made to carry the threat into execution, and a necessity, apparent or real, existed at the time to slay, in order to prevent it." *Vide*, also, Newcomb v. State, 37 Miss. 383; Wesley v. State, ib. 327; Dyson v. State, 26 Miss. 362; 17 Mo. 544; 9 ib. 527; 17 ib. 537; 23 ib. 287; 2 Comst. 202; Roscoe Cr. Ev. 684; 14 Me. 248; 9 Met. 110; 4 Ired. 409; the People v. Shorter, 4 Barb. 460; Russ. on Cr. 789; Bishop Cr. Pr., § 617; 15 B. Mon. 539; Wharton's Am. Cr. L., § 1027, *et seq.*, and cases cited in notes.

By section 2628, Code of 1871, " the killing of a human being, without the authority of law,   *   *   *   shall be murder   *   *   *   when done with a deliberate design to effect the death of the person killed;" and, " when done in the commission of an act imminently dangerous to others, and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual;" and this furnishes the basis of the law of the case at bar.   With only the threat of the deceased reported to him, the accused armed himself with a deadly weapon, and seeking the former, he found him unarmed, and indisposed to a conflict.   Being interrogated, the deceased denied the allegation of threats, and turned away from his opponent, when with a cowardice and brutality almost unparalleled, without the existence of even apparent danger to himself, the accused fired the fatal shot.   The plea that the deceased had " one hand in his pocket," is the invention of a man with murder in his heart, and at best is only a mockery of an excuse, which cannot save the accused from the just consequences of his illegal and brutal act.

The instructions given for the state are commendable for accuracy, as well as brevity.   Those refused for

the defendant had no application to the facts, and were
properly declined. In modifying the single charge
given for the accused, the court erred, inasmuch as the
modification took from the jury every question, save
the mere fact of killing. In a doubtful case, or one in
which this alteration might have influenced the jury
to the injury of the accused, we should have no hesita-
tion in a reversal. But in the case at bar, there is no
element of doubt of any sort. The killing was without
justification, excuse, or palliation. It was simply
murder, and proof of prior threats and of a former diffi-
culty would not alleviate its character, under the cir-
cumstances. The "prisoner's guilt" was the very
question in issue, to be determined by the jury; but,
for this, the court substituted for their finding, simply,
whether the accused killed the deceased, thus with-
drawing from consideration the essential ingredient of
malice. Nevertheless, in view of the just instructions
for the state, and of the facts, which are not conflict-
ing, disputed, denied, or impunged in any way, we shall
not award a new trial. As the case is without doubt,
no injustice has been done the accused. It is hoped,
however, he will seek and find that mercy which is
from above, and which he denied to his unresisting
victim.

The "comments" of the court, included in the bill
of exceptions, are judged to have been an assertion of
the rights, impartiality, and dignity of that tribunal,
when assailed, probably through the zeal of counsel,
leading to an effort, not unusual, to secure a verdict by
a device sometimes successful—an appeal to the jury in
direct antagonism with the court. If correctly under-
stood, the "comments" were appropriate and unobjec-
tionable, if not commendable. Their insertion in the
bill of exceptions is not without precedent; but the
necessity or propriety of so doing, in this instance, is
not perceptible from the record. Code of 1871, § 644.

It follows that the judgment must be affirmed and it is so ordered. Friday the —— day of February next is hereby fixed as the day of execution, when the sentence will be executed by the sheriff of Washington county, between the hours of ten o'clock in the forenoon and two o'clock in the afternoon of that day.